AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Middle District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Carolina Amesty | ) Case No. |
| | )          6:25-mj -1031 |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   June 23, 2020, and July 13, 2020,   in the county of              Orange              in the

      Middle        District of          Florida          , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 641 | Theft of Government Property |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Raquel Garcia Rios, SBA-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date:      January 16, 2025

_____
*Judge's signature*

City and state:              Orlando, Florida

Hon. Robert M. Norway, U.S. Magistrate Judge
*Printed name and title*

**STATE OF FLORIDA**                                    **CASE NO. 6:25-mj-**1031

**COUNTY OF ORANGE**

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Raquel Garcia Rios, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I submit this affidavit in support of a criminal complaint against Carolina AMESTY for two violations of 18 U.S.C. § 641 (theft of government property).

2.      I have been a Special Agent for approximately 15 years. I have been employed with the U.S. Small Business Administration, Office of Inspector General (SBA-OIG) since February 2024. Prior to my employment with SBA-OIG, I was a Special Agent with the United States Department of Treasury, Internal Revenue Service, Criminal Investigation (IRS-CI). My official duties as a Special Agent with SBA-OIG include investigating violations of federal law related to the SBA's operations, programs, grants, and contracts.  I have personally investigated and assisted in investigations related to such violations of Title 18 of the United States Code. I earned a bachelor's degree in business with a concentration in accounting and a master's degree in business administration from Texas A&M International University. In addition, I have received training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, where I learned how to investigate

1

financial crimes as well as appropriate disclosure guidelines and the Federal Rules of Evidence. I completed the Criminal Investigator Training Program at FLETC and the IRS Special Agent Investigative Techniques program at the National Criminal Investigation Training Academy (NCITA).

3.    The facts in this affidavit are based on my personal knowledge and information I learned from other sources, including law enforcement databases, third party records, reports prepared by other law enforcement officers, and conversations I have had with other law enforcement officers and witnesses involved in this investigation.

4.    Because I am submitting this affidavit for the limited purpose of securing a criminal complaint, I have not included every fact that I know about this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause that AMESTY has violated 18 U.S.C. § 641.

## PROBABLE CAUSE

### Background on the EIDL Program and Application Process

5.    The SBA is an executive-branch agency of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enables and provides for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees.

2

6.    In March 2020, the Coronavirus Aid, Relief, and Economic Security Act, or the "CARES Act," was enacted to provide immediate assistance to individuals, families, and organizations affected by the COVID-19 emergency. Among its various provisions, the CARES Act authorized the SBA to offer Economic Injury Disaster Loan (EIDL) funding to business owners and non-profit organizations negatively affected by the COVID-19 pandemic. To qualify, a business or non-profit organization had to be in operation prior to February 1, 2020.

7.    Using the SBA online portal, EIDL applicants submitted personal information and information about the business or non-profit organization in support of each EIDL application, and they did not have to submit supporting documentation of any sort. The application included a jurat-like paragraph where the applicant affirmed that the information submitted was true and correct under the penalty of perjury and applicable criminal statutes.

8.    The application process for an EIDL involved filling out assorted data fields relating to the size of the affected business or non-profit entity, the ownership of said entity, and other information such as the number of employees and, as applicable, gross revenues, cost of goods sold, and non-profit cost of operation for the 12 months prior to the date of the disaster (January 31, 2020). This information furnished by the applicant was then used by SBA application evaluation systems to calculate the principal amount of money the applicant was eligible to receive in the form of an EIDL.

9.    In addition to applying for an EIDL, an applicant could request and

3

then receive up to $10,000 in an EIDL Cash Advance Grant based on the number of employees claimed. The EIDL Cash Advance Grant was disbursed in amounts of $1,000 per claimed employee. Any EIDL Cash Advance Grant funding that was received by an applicant based on the number of claimed employees did not need to be repaid to the SBA if the loan application was ultimately denied by the SBA, or if the applicant declined the EIDL that was offered by the SBA at a later date.

10.    Pursuant to the provisions governing the EIDL program, loan proceeds had to be used by that business on certain permissible expenses. The EIDL (working capital) loans had to be used by the afflicted business to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.

11.    To evaluate EIDL applications, the SBA computer system used automation and system programming to quickly conduct checks of each application submitted by each applicant. The SBA computer system performed checks of the applicant's creditworthiness and evaluated other elements of data furnished by the applicant to identify duplicative applications and indicators of fraudulent activity. The SBA computer system also utilized the information furnished by the applicant— including gross revenues in the 12-month period prior to the disaster, costs of goods sold during that same timespan, and loss of rental income—to determine the dollar amount of the loan offer that the applicant may be extended. If any aspect of the application did not pass the automated evaluation within the SBA computer system, the application's progress was stopped, and an electronic notification was sent to the

applicant regarding the potential cause for the application to be halted. The applicant was then given the opportunity to engage with the SBA and request reconsideration of the application.

### Overview of AMESTY's and a Relative's EIDL Applications

12.     SBA-OIG has identified at least fifteen EIDL loan applications associated with AMESTY and one of her relatives. AMESTY and her relative received more than $500,000 in EIDL loans on behalf of eight entities, including Dinocar Auto Sales LLC, Carolina Amesty Foundation, Central Christian University Inc., Central Christian University Holding Corp., Central Christian Academy Inc., Central Café LLC, Pollo Juan Restaurant LLC, and Jordd Group LLC.

13.     Information filed with the Florida Department of State regarding many of these entities established AMESTY's role and her relative's role at the time of the establishment of the entity and at the time of the EIDL application. Her role in these various entities at the time of the submission of the EIDL applications included Chairwoman, Trustee, Managing Member, Registered Agent, Director, Vice President, and/or President.

14.     A query of the telephone numbers listed on the applications revealed that the registrants of these numbers are AMESTY, her relative, and associated businesses. Subscriber records for IP addresses related to the submission of applications also identified AMESTY and associated businesses. SBA records detail communications with AMESTY concerning many of the loan applications,

5

highlighting her involvement with the submission of those applications.

15.    In 15 of the EIDL applications, the following representations were made

as to the gross revenues for the 12 months prior to the date of the disaster (January 31,

2020) and the number of employees (as of January 31, 2020):

| Application Date | Name of Applicant | Owner | Gross revenues | Number of employees | Result |
|---|---|---|---|---|---|
| 3/31/2020 | Central Christian University, Inc. | AMESTY<br><br>Her relative | $1,200,000 | 16 | $10,000 advance/<br><br>$150,000 loan |
| 3/31/2020 | Pollo Juan Restaurant LLC | AMESTY<br><br>Her relative | $200,000 | 20 | $10,000 advance/<br><br>$52,500 loan |
| 3/31/2020 | Central Christian Academy Inc. | AMESTY | $300,000 | 15 | $10,000 advance/<br><br>$62,500 loan |
| 6/1/2020 | Central Café LLC | AMESTY | $128,000 | 3 | $3,000 advance/<br><br>$24,500 loan |
| 6/1/2020 | Central Christian University Holding Corp. | AMESTY | $180,000 | 2 | $15,000 advance/<br><br>$43,000 loan |
| 6/16/2020 | Jordd Group LLC | AMESTY | $135,000 | 3 | $3,000 advance/ |

|  |  |  |  |  | $29,500 loan |
|---|---|---|---|---|---|
| 6/17/2020 | Carolina Amesty Foundation Inc. | AMESTY | $175,000 | 3 | $3,000 advance/ $84,500 loan |
| 6/22/2020 | American Chaplains Inc. | Her relative | $250,000 | 12 | Failed attempt |
| 6/23/2020 | Universidad Cristiana Central Inc. | AMESTY | $435,000 | 15 | Failed attempt |
| 6/25/2020 | Dinocar Auto Sales LLC | AMESTY | $475,000 | 13 | $37,500 loan |
| 6/25/2020 | American Chaplains Inc. | AMESTY | $185,000 | 12 | Failed attempt |
| 7/1/2020 | Iglesia De Dios Misionera Weston Inc. | AMESTY Her relative | $568,000 | 12 | Failed attempt |
| 7/3/2020 | Iglesia De Dios Misionera Okeechobee, Inc. | AMESTY | $435,000 | 11 | Failed attempt |
| 11/16/2020 | Iglesia De Dios Misionera Weston Inc. | AMESTY Her relative | $568,000 | 12 | Failed attempt |
| 1/11/2021 | Eglise De Dieu Missionnaire Inc. | AMESTY | $550,000 | 11 | Failed attempt |

16.     Based upon investigation conducted to date, the representations as to the gross revenues for the 12 months prior to the date of the disaster (January 31, 2020) are incorrect on many of these applications.  For some of the applications, the entities at issue were not in existence for 12 months prior to the date of the disaster. In situations like these, it is possible that applicants may have been advised by the SBA to provide projected revenues. However, the subpoenaed bank records for many of the entities for which AMESTY applied for EIDLs—including Carolina Amesty Foundation Inc. and Dinocar Auto Sales LLC, discussed in greater detail below— are inconsistent with a good faith representation that the entities would have earned the forecasted revenues.

17.     Indeed, investigators have been able to find little, to no, support for the gross revenues represented in the EIDL applications for the designated time period. Notably, several of the entities for which EIDL applications were submitted did not even open the bank account provided on their EIDL application until after the pandemic had started:

| Name of Business | Date Bank Account Provided on EIDL Application Was Established |
|---|---|
| Central Cafe LLC | 5/24/2020 |
| Jordd Group LLC | 4/9/2020 |
| Carolina Amesty Foundation Inc. | 6/16/2020 (established a day before the date of the EIDL application) |
| Universidad Cristiana Central Inc. | 6/23/2020 (established on the same date as the EIDL application) |

| Dinocar Auto Sales LLC | 6/25/2020 (established on the same date as the EIDL application) |
| American Chaplains Inc. | 6/22/2020 (established three days before the date of the EIDL application) |
| Iglesia De Dios Misionera Okeechobee, Inc. | 6/23/2020 (established near the date of the EIDL application) |
| Iglesia De Dios Misionera Weston Inc. | 7/1/2020 |

18.     As with the gross revenues reported on the EIDL applications in paragraph 15 above, based upon investigation conducted to date, the representations in many of the applications as to the number of employees (as of January 31, 2020) are inflated. A report from the Office of Inspector General for the Small Business Administration noted that the "EIDL application did not clearly define 'employee,'" and thus it was possible that some applicants "may have included independent contractors, seasonal workers, or other individuals who do not meet the IRS definition of 'employee'" in their applications.

19.     A detailed review of two of these applications submitted by AMESTY—Dinocar Auto Sales LLC and Carolina Amesty Foundation Inc.—is below. For each of these entities, AMESTY submitted false information on the EIDL application and then received an EIDL. Additionally, for Carolina Amesty Foundation, AMESTY received an EIDL advance. Records also reveal that AMESTY used the funds for purposes other than the permissible uses under the EIDL program discussed above.

**<u>EIDL Application for Carolina Amesty Foundation Inc.</u>**

20.     On June 17, 2020, AMESTY submitted SBA EIDL application #3305090052 in the name of Carolina Amesty Foundation Inc., a private non-profit organization, through the SBA's online portal.

21.     The application listed AMESTY as the primary contact and CEO of the entity with 100% ownership. AMESTY was the only contact included in the application. The application included AMESTY's correct social security number and date of birth. A business email address using AMESTY's name and AMESTY's registered phone number (407) 758-xxxx were provided as primary contact information. Additionally, AMESTY's residential address, according to Florida Department of Motor Vehicle records at the time the application was submitted, was used on the application.

22.     The application stated that the non-profit organization opened on December 26, 2019, and had 3 employees (as of January 31, 2020). The application also stated that for the 12 months prior to the date of the disaster (January 31, 2020), the gross revenues were $175,000, the cost of goods sold were $0.00, and the non-profit/agricultural cost of operation was $0.00.

23.     The application was approved, and SBA Loan #9662977907 was awarded in the amount of $84,500. An EIDL advance of $3,000 was also awarded, consistent with the representation that there were 3 employees.

24.     The application stated that the pertinent bank account information was a Bank of America (BOA) checking account in the name of Carolina Amesty

Foundation Inc., which had an account number ending in 0089. A review of subpoenaed bank records revealed that the BOA account ending in 0089 was opened on June 16, 2020—the day before the submission of the EIDL application—and AMESTY is the sole signatory on the account.

25.    On June 20, 2020, a Loan Authorization and Agreement for SBA Loan #9662977907 in the amount of $84,500 for Carolina Amesty Foundation Inc. was e-signed by AMESTY. In so doing, AMESTY certified, among other things, that the representations in the loan application were true and correct and that the proceeds would be used for permissible purposes.

26.    On June 22, 2020, the $3,000 EIDL advance was deposited into AMESTY's BOA account ending in 0089. The following day, $84,400 in EIDL proceeds was deposited into AMESTY's BOA account ending in 0089. This is the total amount of the funded EIDL less $100, which the SBA charged applicants to pay the Uniform Commercial Code (UCC) lien filing fees and a third-party UCC handling charge to secure EIDLs of more than $25,000.

27.    But the investigation to date has revealed no evidence to support the gross revenue reported on the application: $145,000 for the 12-month period prior to the date of the disaster (January 31, 2020). To the contrary, in response to a request to the IRS as to whether Carolina Amesty Foundation Inc. filed a Form 1065, Form 1120, or a Form 940 in 2019, the IRS advised it had not. Likewise, in response to a subpoena to a Certified Public Account (CPA) and tax preparer for AMESTY and her relative, the CPA did not provide any tax returns for 2019. Moreover, the

11

application stated that the non-profit did not even begin operations until December 26, 2019, consistent with the filing of Articles of Incorporation for the entity, and the bank records, as discussed below, contain no evidence of the entity receiving any revenue during the 12-month period prior to January 31, 2020, or any other period.

28.    Likewise, investigators have been unable to find evidence to support the number of employees listed on the application: 3 (as of January 31, 2020). The Department of Florida Commerce (DFC) had no wage and earnings records for Carolina Amesty Foundation for the quarter ending March 2020. Additionally, the IRS did not receive a Form 941 for Carolina Amesty Foundation Inc. for the quarter ending March 2020. A Form 941 is submitted on a quarterly basis by an employer to report, among other things, the number of employees and wages paid to those employees.

29.    Records from BOA show that the Carolina Amesty Foundation Inc. account ending in 0089 do not support the information on the application concerning gross revenues and number of employees. To the contrary, the account was not opened until June 16, 2020—well after the pandemic had started. Following the opening deposit of $50, the next transactions on the account were the credits from the SBA for the $3,000 EIDL advance and the $84,400 EIDL proceeds (the total amount of the EIDL less the $100 the SBA had to pay to secure the loan). Thus, there was no activity in the account prior to the receipt of the SBA loans—none related to business expenses or revenues, and none related to paying employees.

30.    A financial analyst with the Federal Bureau of Investigation (FBI)

analyzed the use of the EIDL proceeds after they were deposited into BOA account ending in 0089—none of which appear to be spent on permissible expenses for Carolina Amesty Foundation Inc. under the EIDL program. A chart memorializing the expenditure of the funds between July 9, 2020, and December 17, 2020, is below:



31.     Other than the transactions shown in the chart above, the bank records reveal that there were very few other funds deposited into or expended from the

account. From June 2020 (when the account was opened) through December 2020, the only funds that entered or left the bank account for Carolina Amesty Foundation Inc. were the SBA funds other than the initial $50 opening deposit and $2,175 in other deposits in November 2020—which is inconsistent with not only the gross revenues reported on the EIDL application but also the monthly breakdown of gross receipts reported on the EIDL application.

32.    The FBI also analyzed how the EIDL funds were used from the accounts listed in the chart above after being transferred from Carolina Amesty Foundation Inc.'s BOA account ending in 0089. A review of the activity on JPMC account ending in 1671 (an account for Central Christian University, Inc., another entity associated with AMESTY and her relative) revealed that the $41,000 cashier's check drawn on BOA account ending in 0089 was deposited into the account on July 9, 2020, along with four other cashier's checks drawn from other BOA accounts, for a total deposit of $341,500. The deposited funds were then disbursed primarily via transfers to JPMC accounting ending in 8828 (another account for Central Christian University), Zelle payments to Pollo Juan Restaurant LLC (another entity associated with AMESTY and her relative), payments to Black Business Investment Fund, and payments on credit cards.

33.    A review of the activity on BOA account ending in 1782 (an account for Pollo Juan Restaurant LLC, with AMESTY and her relative as signatories) indicated that the $25,600 in SBA funds transferred to that account were expended on operational costs related to the restaurant.

14

34.     A review of the activity on BOA account ending in 3263 (an account for AMESTY, with AMESTY as the sole signatory) showed that the $9,000 in SBA funds that were transferred to that account were in turn transferred to BOA account ending in 3250 (another account for AMESTY, with AMESTY as the sole signatory) where the funds were expended on personal expenses. The SBA funds totaling $4,250 transferred directly into BOA account ending in 3250 were also expended on personal expenses of AMESTY.

35.     Moreover, in February 2021, AMESTY applied for a Targeted EIDL Advance for Carolina Amesty Foundation Inc. In support of this request for additional EIDL funds,  AMESTY provided a breakdown of monthly gross receipts for December 2019 through January 2021 as follows: $45,000 (December 2019), $30,000 (January 2020), $50,000 (February 2020), $20,000 (March 2020), $16,000 (April 2020), $4,000 (May 2020), $3,000 (June 2020), $2,000 (July and August 2020), $5,000 (September 2020), $7,000 (October, November, and December 2020), and $4,000 (January 2021). But again, the bank records do not support that there were any revenues for Carolina Amesty Foundation during that timeframe.

### EIDL Application for Dinocar Auto Sales LLC

36.     On June 25, 2020, AMESTY submitted SBA EIDL application #3306570456 in the name of Dinocar Auto Sales LLC, an automobile dealership, through the SBA's online portal.

37.     The application listed AMESTY as the primary contact and owner of the entity with 100% ownership. AMESTY was the only contact included in the

15

application. The application included AMESTY's correct social security number and date of birth. A business email address using AMESTY's name, different than the one used for the Carolina Amesty Foundation, was provided, and AMESTY's phone number and address were the same as she listed on the Carolina Amesty Foundation Inc. EIDL application. The business address was listed as xxxx Lake Breeze Dr., Orlando, FL 32808, and AMESTY's phone number was listed as the business phone number.

38.    The application stated that the entity opened on November 20, 2019, and had 13 employees (as of January 31, 2020). The application also stated that for the 12 months prior to the date of the disaster (January 31, 2020), the gross revenues were $475,000, the cost of goods sold were $380,000, and the rental property losses were $55,000. Unlike for the Carolina Amesty Foundation EIDL application, this application did not include a breakdown of gross receipts for any months in 2019, 2020, or 2021.

39.    The application was approved on July 9, 2020, and SBA Loan #1265098104 was awarded in the amount of $37,500.

40.    The application stated that the pertinent bank account information was Bank of America (BOA) checking account in the name of Dinocar Auto Sales LLC, which had an account number ending in 5798. A review of subpoenaed bank records revealed that the BOA account ending in 5798 was opened on June 20, 2020—five days before the submission of the EIDL application—and AMESTY is the sole signatory on the account.

16

41.     On July 9, 2020, a Loan Authorization and Agreement for SBA Loan #1265098104 in the amount of $37,500 for Dinocar Auto Sales LLC was e-signed by AMESTY. In so doing, AMESTY certified, among other things, that the representations in the loan application were true and correct and that the proceeds would be used for permissible purposes.

42.     On July 13, 2020, $37,400 was deposited into AMESTY's BOA account ending 5798. This is the total amount of the funded EIDL less $100, consistent with the $100 fee for the Carolina Amesty Foundation Inc. EIDL.

43.     But the investigation to date has revealed no evidence to support the gross revenue reported on the application: $475,000 for the 12-month period prior to the date of the disaster (January 31, 2020). To the contrary, in response to a request to the IRS as to whether Dinocar Auto Sales LLC filed a Form 1065, Form 1120, or a Form 940 in 2019, the IRS advised it had not. Likewise, in response to a subpoena to AMESTY's CPA, the CPA did not provide any tax returns for 2019. Moreover, the application stated that the entity did not even begin operations until November 20, 2019, consistent with the filing of Articles of Incorporation for the entity, and the bank records do not contain support for the stated gross revenues as discussed below.

44.     Likewise, investigators have been unable to find evidence to support the number of employees listed on the application: 13 (as of January 31, 2020). The DFC had no wage and earnings records for Dinocar Auto Sales LLC for the quarter ending March 2020. Additionally, the IRS did not receive Forms 941 for the Dinocar Auto Sales LLC for the quarter ending March 2020.

17

45.     As part of this investigation, FBI agents visited the business address listed on the EIDL application, xxxx Lake Breeze Dr., Orlando, FL 32808, and spoke with an employee of the construction business operating out of the location. The employee stated she had worked out of that location for approximately four years and that she was unfamiliar with Dinocar Auto Sales; however, she had seen mail addressed to Dinocar.

46.     In response to a subpoena to Dinocar Auto Sales LLC, business records were provided for the years 2019 through 2022 that included incorporation records, business financial records, employment records, and loan records. The 2019 incorporation records included the Articles of Incorporation for the entity and a letter from the Florida Department of State certifying Dinocar Auto Sales LLC as a limited liability company organized under the laws of the state filed on November 20, 2019—the same date of incorporation. Also included under the incorporation records was an IRS notice dated December 10, 2019, with the assigned employer identification number for the entity.

47.     As to the business financial records provided, a few things are worth noting. For starters, there were no records to indicate that Dinocar Auto Sales was even licensed to operate as a car dealership. To the contrary, a search of public records on the Florida Highway Safety and Motor Vehicles showed that Dinocar Auto Sales LLC had not retained any license to operate as a car dealer. Among the 2019 business financial records provided were a Florida dealer registration form for Fons Auto Sales Corp. and various invoices for purchases of vehicles by Fons Auto

18

Sales Corp. Agents interviewed the owner of Fons Auto Sales Corp. who confirmed that his dealer license had been used to purchase vehicles from auction for AMESTY's relative, but stated he did not recognize Dinocar Auto Sales LLC.

48.    The only records provided as part of the 2019 business financial records that referenced Dinocar Auto Sales LLC included one auto repair invoice and two inventory lists. A letter of intent for rent and subsequent purchase of a property listing AMESTY's relative as the purchaser (with no mention of Dinocar Auto Sales), dated December 11, 2019, was also provided—this letter was signed only by the buyer and did not appear to be executed.

49.    The 2019 employment records provided included the following: a copy of a Learner's License for another relative of AMESTY, a copy of a Driver's License for AMESTY's relative, an employment application for E.Q.S., a copy of a Driver's License for E.Q.S, and an IRS Form W-9 (Request for Taxpayer Identification Number and Certification) for E.Q.S. The employment application for E.Q.S. stated that his desired position was P.E. Instructor and that the date he could start working was September 30, 2019—Dinocar Auto Sales LLC opened in November 2019. Furthermore, the position listed is not consistent with a car dealership business.

50.    Records from BOA show that the activity in Dinocar Auto Sales LLC's account ending in 5798 does not support the information on the application concerning gross revenues, cost of goods, rental properties, or number of employees. To the contrary, the account was not opened until June 20, 2020—well after the pandemic had started. Following the opening deposit of $100, the next transaction

on the account was the credit from the SBA for the $37,400 EIDL proceeds (the total

amount of the EIDL less the $100 the SBA had to pay to secure the loan). Thus,

there was no activity in the account prior to the receipt of the SBA loan—none

related to business expenses or revenues, and none related to paying employees. The

2020 business financial records provided include the bank statements for BOA

account ending in 5798 for Dinocar Auto Sales LLC, which are consistent with the

subpoenaed BOA records showing the $100 deposit made on June 25, 2020,

followed by the SBA $37,400 EIDL proceeds, and no business-related revenue or

expenses. All funds were fully expended by August 28, 2020, and one deposit of $100

was made on September 2, 2020.

    51.    A financial analyst with the FBI analyzed the use of EIDL proceeds

after they were deposited into BOA account ending in 5798—again, none of which

appear to be spent on permissible expenses for Dinocar Auto Sales LLC under the

EIDL program. A chart memorializing the expenditure of the funds between July 30,

2020, and August 28, 2020, is below:



52.    Other than the transactions shown in the chart above, the bank records

reveal that there were very few other funds deposited into or expended from the

account. From June 2020 (when the account was opened) through December 2020,

the only funds that entered or left the bank account for Dinocar Auto Sales LLC

were the SBA funds other than the initial $100 opening deposit and one other $100

deposit in September 2020—which is inconsistent with the gross revenues reported on the EIDL application.

53.     The FBI also analyzed how the funds were then used from the accounts listed above after being transferred from Dinocar Auto Sales LLC's BOA account ending in 5798. A review of the activity on BOA account ending in 3250 (an account for AMESTY, with AMESTY as the sole signatory) revealed that following the receipt of the transfers for $16,000, the funds were expended on personal expenses, including purchases at City Furniture and payments on credit cards.

54.     A review of the activity on BOA account ending in 1782 (an account for Pollo Juan Restaurant, LLC, with AMESTY and her relative as signatories) showed that the $15,300 in SBA funds transferred to that account were expended on operational costs related to the restaurant.

## CONCLUSION

55.     Based on the foregoing, I submit that probable cause exists that on June 23, 2020 and July 13, 2020, AMESTY did knowingly and willfully embezzle, steal, purloin, or convert to her own use EIDL proceeds in the amount of $84,500 (Carolina Amesty Foundation Inc.) and $37,500 (Dinocar Auto Sales LLC) with the

intent to deprive the United States and Small Business Administration of the use and benefit of the funds, in violation of 18 U.S.C. § 641.

Raquel Garcia Rios
Special Agent
United States Small Business Administration
Office of Inspector General

Sworn to before me and signed
in my presence on this 16th day
of January, 2025.

HON. ROBERT M. NORWAY
United States Magistrate Judge

23